Glenn P. KIRKLAND, Lloyd Barrentine, R. C. Moore, W. D. Rogers, Charles W. Coble, Robert Jones, C. L. Allen, Jim Lovell, Appellees,

v.

ARKANSAS–BEST FREIGHT SYSTEMS, INC.; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Southern Conference of Teamsters and Central States Conference of Teamsters, Appellants.

Glenn P. KIRKLAND, Lloyd Barrentine, R. C. Moore, W. D. Rogers, Charles W. Coble, Robert Jones, C. L. Allen, Jim Lovell, Appellees,

v.

ARKANSAS–BEST FREIGHT SYSTEMS, INC., Appellant.

Nos. 79–1580, 79–1620.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1980.

Decided Aug. 25, 1980.

Raymond F. Beagle, Jr., Gage & Tucker, Kansas City, Mo., argued, Richard B. McKelvey and Robert J. Harrop, Kansas City, Mo., and Thomas Harper, Harper, Young & Smith, Fort Smith, Ark., on brief, for Arkansas-Best Freight Systems, Inc.

L. N. D. Wells, Jr., Mullinax, Wells, Baab, Cloutman & Chapman, Dallas, Tex., argued, David Leo Uelmen and Scott D. Soldon, Goldberg, Previant & Uelmen, Milwaukee, Wis. and John T. Lavey, Little Rock, Ark., on brief, for Intern. Broth. of Teamsters, etc., et al.

David E. Smith, Bryant, Ark., argued, Ted Boswell, Bryant, Ark., on brief, for appellees.

* The Honorable Gerald W. Heaney, United States Circuit Judge, sitting as a district judge by designation.

Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This is a labor case involving the interstate trucking business that was decided adversely to the defendants in 1979 by the United States District Court for the Eastern District of Arkansas.* Two appeals were taken; those appeals have been consolidated and considered together.

The formal plaintiffs are Glenn P. Kirkland, Lloyd Barrentine, R. C. Moore, W. D. Rogers, Charles W. Coble, Robert Jones, C. L. Allen and Jim Lovell, who are over the road truck drivers who are or have been employed by the corporate defendant, Arkansas-Best Freight Systems, Inc. (ABF), which is an interstate motor carrier of freight. Three labor organizations are also named as defendants; they are the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereinafter called the Teamsters or the International Union, the Southern Conference of Teamsters, and the Central States Conference of Teamsters. Named as individual defendants originally were Frank E. Fitzsimmons, General President of the International Union; Roy L. Williams, Roy Lane and W. C. Smith, who in 1975 were union employees and representatives. However, in the course of proceedings in the district court the case was dismissed as to the individual defendants.

Plaintiffs sued individually and on behalf of a large number of other ABF drivers who held employment in Arkansas prior to the change of operations that was jointly approved by management and labor in 1975.

Plaintiffs alleged that the change in operations that has been mentioned has had an adverse economic impact on them; that the change in operations was permitted in violation of law and in violation of underlying collective bargaining agreements between

interstate truckers, including ABF, the Teamsters and the two Teamster regional Conferences that have been identified; that the change in operations committee that finally approved ABF's third proposal for a change was not properly constituted; that the proceedings before the committee were not fairly and properly conducted; and that the labor representatives on the committee failed to represent fairly individual truck drivers. Certain other charges were also made which we find it unnecessary to mention.

The suit was filed on October 30, 1975 which was very soon after the challenged change in operations had been approved and probably before it had been implemented to any substantial extent, if at all. The relief sought by plaintiffs was primarily injunctive. In due course the defendants answered and denied that plaintiffs were entitled to any relief.

Subject matter jurisdiction was properly based on section 301(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185(a).

Although the complaint prayed for both preliminary and injunctive relief, the prayer for preliminary relief was never brought into focus before the district court,[1] the docket of which was extremely congested at the time and was to become more so.

The case was finally tried without a jury in December, 1977, and a voluminous record was compiled. In July, 1978 findings of fact, conclusions of law and memorandum opinion dealing with the basic issues between the parties were filed. By that time ABF's change of operations had been put into effect and had had whatever adverse impact on Arkansas drivers that it was going to have.[2]

The trial judge found that the drivers in question were entitled to relief. In the situation with which he was confronted he concluded that while some former Little Rock drivers were or might be entitled to some equitable relief, basically, the relief granted should be accrued monetary damages sustained by the affected drivers to the date of trial. No awards of future damages were made. Liability for imposed damages was held to be joint and several.

As to accrued damages, the trial court prescribed a formula for the calculation of such damages and made awards in favor of twelve drivers who had presented damage evidence to the court.

With respect to other drivers the trial judge called on counsel to try to stipulate as to amounts due respective drivers, and indicated that if counsel could not agree a special master would be appointed to assess individual damages. See Fed.R.Civ.P. 53(b).

The parties were not able to agree, and on November 27, 1978 the matter of damages was referred to Robert F. Fussell, Esq. of the Little Rock bar, an experienced and capable attorney, with directions to assess certain damages in accordance with the formula set out by the trial judge in his original findings of fact. Detailed instructions as to particular drivers were given to Master Fussell.

After an evidentiary hearing the master made his determinations and incorporated them into a report that he filed with the court on March 15, 1979.

1. The case was assigned originally to the late District Judge Terry L. Shell. After his death, the case was reassigned to Chief District Judge G. Thomas Eisele, and then ultimately assigned to Judge Heaney.

2. While we will return to the subject later, we pause to note at this point that in 1975 ABF was operating in about twenty-five states and had terminals in various cities throughout the country. Some of those terminals were located in the Southern Conference area and others were located in the Central States Conference area. In Arkansas ABF operated one terminal at Little Rock and another at Fort Smith in the Southern Conference area. The change here challenged involved shift of ABF's operational emphasis from the Southern Conference area to the Central States Conference area. The result was a loss of driver positions at both Little Rock and Fort Smith; after the change had been implemented ABF ceased to maintain its Fort Smith terminal. The Little Rock terminal has remained operational.

On June 25, 1979 the district court filed supplemental findings and conclusions in which it adopted the report of the master. On the same day a final judgment was entered which, in addition to the limited equitable relief that has been mentioned, made monetary awards to seventy drivers in varying amounts totalling $258,868.78.

Notices of appeal were timely filed.

## I.

For reversal, the "labor defendants" contend that since the district court found that the change of operations of ABF was not impermissible under the collective bargaining agreements, the district court fell into fundamental error in failing to dismiss the case in its entirety; that the district court erred in holding that the labor defendants owed any duty of fair representation to the truck drivers; that the district court erred in finding that such duty, if it existed, had been breached; that no damages should have been awarded to plaintiffs; that in any event the damages awarded are too speculative to stand scrutiny; and that the labor defendants should not be held jointly and severally liable with ABF for damages that resulted from the approval of a change of operations proposed by ABF.

ABF in arguing for reversal generally makes in obverse the same arguments that are advanced by the labor defendants. As to joint and several liability, ABF contends that it should not be held jointly and severally liable with the labor defendants, and ABF contends alternatively that in any event damages should have been apportioned between it and the labor defendants in proportion to fault.

It goes without saying that the plaintiffs contend that there was no error in the holdings of the district court, and that the judgment of that court should be affirmed.

## II.

From the standpoint of labor relations the interstate trucking industry is highly organized and highly unionized. The dominant International Union, and the one involved here is the Teamsters Union and its subordinate organizations, including ultimately local unions affiliated with it.

For labor relations purposes, the country is divided into "conference areas." One of those areas is the Southern Conference area that includes Arkansas and a number of other southern states. Another is the Central States Conference area made up of a number of northern and midwestern states, including Missouri and Ohio.

During, prior to and after 1975 interstate truckers and the Teamsters were parties to what is known as the National Master Freight Agreement. In addition, truckers were parties to agreements between them and the respective area Conferences of the Teamsters. Since ABF was operating in both the Central States Conference area and the Southern Conference area, it was evidently a party to agreements with both Conferences. All of those agreements were basic agreements relating to fundamental labor relations problems in the trucking industry. Those agreements did not purport to deal with individual employees of individual truckers.

At the local level, individual employees are represented for collective bargaining and other purposes by local unions affiliated with the International Union. Subject to prescribed limitations, it is the function of the locals to negotiate collective bargaining agreements with individual employers, to process employee grievances, and in general to give fair representation to employees who may stand in need of representation.

It is safe to say that in most, if not all, Teamster collective bargaining contracts the principle of seniority is recognized. There are, however, different types of seniority.

To start with, there is "terminal seniority" which prevails in the Central States Conference area. Under that system an employee has seniority only at the terminal at which he is employed.

At the other end of the scale there is "system seniority" which is recognized in

the Southern Conference area. Under that system an employee can exercise seniority rights at any point in his employer's system, at least within the same Conference area.

A variant is "modified" system seniority which is also recognized in the Southern Conference area. Where that arrangement is in force, an employee can exercise system seniority but only if he is unable to hold his position at his base terminal.

The trucking business is not static, and at times a trucking company finds it necessary or desirable to make a change in it operations. Such a change may affect adversely individual drivers from the standpoint of seniority or otherwise. The change may involve shifts of employees from one point to another in the same Conference area or it may involve shifts from one Conference area to another.

The underlying agreements with which we are concerned provided that a proposed change in operations had to be approved by a "Change of Operations" committee made up of equal representatives of labor and management. If only one Conference area was involved, the representatives were to come from the same area. If more than one Conference area was involved, both areas were to be equally represented.

### III.

In 1975 ABF desired to make a substantial change in its operations so as to shift emphasis from terminals in the Southern Conference area to terminals in the Central States Conference area, principally to the terminal located in Dayton, Ohio.

ABF did not find it easy to obtain "Change of Operations" committee approval of its proposal, and it had to withdraw the first two plans that it submitted. The third plan was approved in September, 1975, and was put into effect.

The first committee consisted of two employer representatives and two union representatives. The employer representatives were Hal Franke from the Central States Conference and M. B. Harp from the Southern Conference. The Union representatives were Roy Lane from the Central States Conference and W. C. Smith from the Southern Conference. It will be recalled that both Lane and Smith were named as parties defendant in this case. As to M. B. Harp, it is to be observed that he owned 1213 shares of stock in a holding company identified as ABC which had a subsidiary interest in ABF.

The second committee consisted of three employer and three union representatives. The employer representatives were R. Pulliam for the Southern Conference, B. Braziel for the Central States Conference, and K. Skaggs for the Eastern States Conference. On the union side, the Southern Conference was represented by W. C. Smith; the Central States Conference was represented by K. Rittman, and the Eastern States Conference was represented by W. Neidig.

It will be observed that the consists of those two committees conformed to the requirements of the underlying agreements.

A substantially different situation existed with respect to the third committee that finally approved ABF's modified plan. On both sides of the table the Central States Conference area was represented by two people and the Southern Conference area was represented by only one. That unbalanced consist was in complete violation of the collective bargaining contracts. Additionally, it appears that from the union standpoint the Southern Conference was represented by W. C. Smith, and that the Central States Conference was represented by Roy Lane and R. Fularczyk who seems to have done nothing but sit in his chair. From the employer's standpoint the committee was made up of Hal Franke and Wayne Henderson from the Central States Conference and M. B. Harp, who has been mentioned, from the Southern Conference.

The district court refused to accept the testimony of Lane and Smith to the effect that unbalanced committees in a situation of this kind had been sanctioned by custom and usage. The trial judge also found that Lane was strongly partisan on behalf of the Central States Conference and dominated

the proceedings, and that Smith, the representative of the Southern Conference, took no active part in the proceedings and simply read a newspaper and smoked a cigar during the committee sessions.

The district court also found that a labor relations employee of ABF, Don Little, actively lobbied Lane and Smith in advance of the meeting for their support of the proposal, that Little took up the matter with employer representative Franke and that Franke assisted Little in the preparation of the change proposal that was presented to the committee.

The district court also found that due to his ownership of ABC stock, M. B. Harp had a conflict of interest that rendered it improper for him to serve on the change of operations committees involving ABF.

### IV.

The district court held that the particular change of operations that the third committee approved was not, in and of itself, impermissible, and that it would have been permissible had the committee been properly constituted, had its proceedings been fairly conducted, and had a complete record of the proceedings been made, all as required by the underlying contracts, the relevant provisions of which are set out in full in the district judge's findings of fact.

The district court found and concluded, however, that the conditions just indicated had not been met, that the committee was unbalanced in favor of the Central States Conference, that Harp's membership on the committee was improper, that Lane impermissibly dominated the proceedings, and that Smith as labor representative of the Southern Conference was a complete cipher and made no effort to play an active or intelligent role in the proceedings. The district court also found that while the committee was required to have a complete transcript of the proceedings made, that was not done, and that the transcript that was prepared was subject to certain significant omissions. Further, as we have seen, the court found that the ABF employee, Little, lobbied the labor members of the committee, Lane and Smith, and also lobbied Central States Conference management representative, Franke, and secured Franke's assistance in the preparation of the third change of operations plan that was finally approved.

In view of the defect in the make-up of the committee and of the procedural defects that have been outlined, the district court was of the opinion that the action of the committee was in violation of the National Master Freight Agreement, the two supplementary Conference agreements, and the procedural provisions set out by the National Grievance Committee established by the NMFA.

The district court also held that ABF and the labor defendants were jointly and severally liable for the violations that brought about final approval of the change of operations involved in this case.

In general we agree.

In doing so, we recognize at the outset that change of operations committees provided for in contracts between the Teamsters and trucking companies are not courts and that proceedings before such committees are not "judicial proceedings." Those observations, however, do not answer the question before the district court and before us.

■ It is clear from the materials before the court and mentioned by Judge Heaney in his findings and conclusions that the parties to the agreements in question bound themselves to follow certain procedures in connection with employer proposed changes of operations. We think that as far as third parties who might be adversely affected by a particular change in operations were concerned, the International Union and the employer seeking the change were required to follow the procedures on which they had mutually agreed. We are also satisfied that individual truck drivers, like the plaintiffs in this case, adversely affected by a change of operations improperly approved have standing to challenge the change in an action brought under section 301(a) of the Taft-Hartley Act.

It is contended that an international union like the Teamsters and its Conference subordinates owe no duty of "fair representation" to individual members of local unions affiliated with the Teamsters. We think it fair to say that an international union does not owe a personal duty of fair representation to a member of a local union or to an individual employee of the same kind or to the same extent that the local union owes such a duty to an individual employee in a conventional field of conflict between that employee and his employer.

But it must be kept in mind that one of the purposes of the change of operations committees is to protect ultimately the rights of individual employees, and we think that those employees have at least the right to insist that procedural safeguards that the International Union and members of the trucking industry imposed on themselves be observed. And that was not done in this case.

## V.

Turning now to a discussion of the propriety of the remedies prescribed by the district court, there are some preliminary observations to be made.

The first proposed change of operations put forward by ABF involved the shifting of business away from terminals that were maintained in Fort Smith and Little Rock, Arkansas, Atlanta, Georgia, and Cape Girardeau and St. Louis, Missouri. Arkansas and Georgia are in the Southern Conference area, whereas St. Louis and Cape Girardeau, Missouri are in the Central States Conference area; another terminal maintained by ABF is in Kansas City on the western border of Missouri.

The first plan called for the elimination of 68 jobs in all of the terminals that have been mentioned, except Kansas City. Little Rock and Cape Girardeau were the hardest hit with a loss of 18 jobs at each place. Fort Smith came next with a loss of 14 jobs; and Atlanta, Georgia and St. Louis, Missouri were both affected adversely in that each of those terminals would lose 9 jobs.

The "gaining terminals" were Cincinnati and Dayton, Ohio, Asheville, North Carolina, Indianapolis, Indiana, and Kansas City, Missouri. Sixty-one positions were to be shifted to those terminals.[3]

The big gainer under this plan was Dayton, Ohio that was to pick up 40 jobs; Cincinnati came next with a gain of 9. Asheville was to pick up 3 jobs; Indianapolis was to gain 8; and Kansas City was to gain 1.

The proposed change was vigorously resisted by the Little Rock, Fort Smith, Cape Girardeau and St. Louis locals because of significant job losses that would be suffered at the cities just mentioned. Roy Lane also objected to the proposal, and the district court found that Lane was the dominating member of the committee. Lane, W. C. Smith and others suggested changes in the proposal be made, and the original proposal was withdrawn.

A second proposed change was submitted to a new committee and is discussed in the district court's Finding of Fact No. 15. Under that proposal drivers employed at the affected terminals would be permitted to make "paper bids" for runs out of other terminals without actually having to move their residences. The same local unions that had opposed the first plan also opposed the second, and the Kansas City local likewise objected. That plan was withdrawn.

The third and final approved plan affected 50 rather than 68 positions. By far the heaviest losers were Little Rock (25) and Fort Smith (14). Cape Girardeau's loss under the third plan (6) was much less than its loss under the first plan (18), and the St. Louis loss was reduced from 9 to 5.

Again, Dayton, Ohio was the big gainer (38). Cincinnati and Indianapolis gained 5 positions each, and Kansas City gained 2. The Atlanta terminal which was a loser under the first plan, and the Asheville terminal that was a gainer under the first plan do not appear to have been affected one way or the other by the third plan.

---

**3.** It would seem that the plan involved the simple elimination of seven positions.

Quite obviously, any change of operations on the part of ABF, no matter how fairly and reasonably considered, which shifted jobs from points west of the Mississippi River to points east of that river and north of the Ohio River was bound to affect adversely drivers employed at the "losing terminals." A driver employed at one of the "losing terminals," if he did not have enough seniority to hold his job at his original terminal after the reduction in force, would either have to go to a layoff status or seek work elsewhere within the employer's system.

The district court specifically found that under the final plan drivers at Little Rock and Fort Smith were not permitted to "follow their work" to St. Louis and Cape Girardeau. That meant that, ignoring Kansas City, adversely affected drivers who did not want to be laid off would have to move to Dayton, Cincinnati or Indianapolis. At those terminals former Arkansas drivers would lose their "system seniority" and "modified system" seniority and would be governed by the "terminal seniority" in force in the Central States Conference area.

A driver who was required to move in order to keep his job might lose a regular run at the old terminal, and he might find difficulty in obtaining regular work at the new terminal with the difficulty being due in part to the "terminal seniority system" in the Central States Conference area. Additionally, the driver would incur moving and relocation expenses. However, under the terms of the NMFA the employer was required to bear those expenses.

Having made those general comments, we will proceed to a discussion of the specific relief granted by the district court.

## VI.

As we have said, the district court awarded some limited equitable relief and very substantial monetary relief.

The court dealt with equitable relief in Finding of Fact No. 35. On this phase of the case the plaintiffs had contended that the change of operations decision should simply be set aside, and that the status quo be restored. Defendants had contended that the status quo be maintained initially, that a new committee should be selected, and that the new committee should have the power to retain, amend or set aside the existing change of operations decision. The district court found that for various reasons neither approach was equitable, and rejected both of them. We accept the court's determination.

The trial judge then prescribed his own equitable relief which was as follows:

In light of the above, it is the order of the Court that plaintiffs who had accepted a transfer to a terminal other than Little Rock shall be given an opportunity to transfer to Little Rock whenever a vacancy occurs on the Little Rock board. The parties shall agree to reasonable procedures for notifying the plaintiffs of these vacancies and their manner of acceptance, and shall submit these procedures to this Court within thirty days of the date that final judgment is entered herein.

Plaintiffs shall be given the opportunity to return to Little Rock in order of their seniority, but no plaintiff shall have more than one opportunity. On returning to Little Rock, the plaintiffs shall be given a position on the Little Rock seniority board commensurate with their total seniority with Arkansas-Best. Expenses incurred in such retransfer shall be borne by the defendants in accordance with the principles heretofore established. Upon retransfer to Little Rock, employees will have their Southern Conference modified seniority restored to them.

We have no trouble with that award and approve it. Our real trouble is with the respective awards of monetary damages.

The district court found that when the change of operations went into effect the Little Rock terminal employed 150 drivers, 18 of whom were on layoff status. The court found that as of the time in question there were 25 vacancies in the Central States Conference area with most of them being at Dayton. Twenty-five drivers were

given the opportunity to bid into the "master active pool" and then into a Central States terminal. Twenty-one Little Rock drivers transferred to the Central States Conference area and four were placed in a layoff status.

Under the modified system of seniority that prevailed in the Southern Conference area, affected Fort Smith drivers had three choices: (a) they could accept layoff status, remain in Fort Smith and hope to be recalled to duty; (b) they could transfer into the Central States Conference area; or (c) they could "bump" into any other terminal in the Southern Conference area where junior men were employed. Twelve of the 14 affected Fort Smith drivers bumped into the Little Rock terminal which required the displacement of an equal number of Little Rock drivers. Those men had the choice of being laid off or transferring into the Central States Conference area.

The trial judge placed the affected employees into two categories: drivers who did and did not transfer out of Little Rock or Fort Smith to other terminals in the Central States Conference area or in the Southern Conference area.

With respect to drivers who transferred, the court fixed their damages at sums representing unreimbursed moving expenses without any regard to any increases in earnings achieved by the transferring driver.

As to drivers who did not transfer out of Little Rock or Fort Smith and who were laid off, the district court found that they were entitled to damages based on a detailed formula which the district court established. The court then made awards to eleven specific drivers and found that one driver who had undertaken to establish a damage claim was not entitled to anything. The awards ran from $8,000.00 for one driver to zero. The lowest award affirmatively made was $1,400.00. The other awards were in varying amounts between $8,000.00 and $1,400.00.

In its order of reference filed on November 27, 1978 the district court first found that ten identified plaintiffs were not entitled to any damages. They have not undertaken to appeal from that ruling, and we accept it.

The court then proceeded to refer the claims of several different groups of plaintiffs to the special master with directions to the master to make findings as to the individual members of the respective groups of plaintiffs affected by the reference. The district court announced that it would hold a hearing on December 22 to pass on the claims of four plaintiffs whose claims had not been referred to the master; and the order contained some minor provisions that are not in controversy here.

The special master proceeded with diligence to discharge the duties of his reference, and he conscientiously followed the instructions that he had received from the district court. The master made awards in favor of a number of the drivers and rejected the claims of others.

The damages situation was summed up in supplemental findings of fact, conclusions of law, and opinion filed on June 25, 1979; final judgment was rendered on the same day. The report of the special master was in all respects approved.

The special master awarded damages totalling $127,117.00. The ultimate award of the district court, expressed in the final judgment, was $258,868.78. That award included the awards made by the court in its initial findings of fact and conclusions of law and also included the awards made by the special master.

The defendants attack those awards. They contend, first, that plaintiffs proved no breach of the collective bargaining agreements and for that reason are not entitled to damages. We do not accept the premise that the plaintiffs failed to show a breach of the agreements. That matter has been discussed already.

■ Alternatively, and more cogently, the defendants contend that assuming a breach of contract plaintiffs have failed to show that they sustained any damages as a proximate result of the particular breaches

of contract found by the district court. For that reason, defendants say, the awards were basically "speculative." The defendants also say that the individual awards, when considered in connection with the several categories of damages set out in the trial judge's original findings and in his order of reference, are too speculative to stand scrutiny.

We have given this phase of the case careful consideration and are forced to the conclusion that the defendants are correct in their contention that the plaintiffs failed to prove damages caused by the errors in connection with the proceedings before the change of operations committee which the district court found to have been in violation of the NMFA and the respective Conference agreements.

It is clear from the record that ABF had a right to change its operations by the shift of operational emphasis that has been described. It is also clear that any such change in operations would necessarily involve the transfers of drivers out of Little Rock and Fort Smith, and that a number of Little Rock drivers would have to move to the Dayton terminal in order to retain work.

It was inevitable that the change would have adverse economic impacts both on the transferring drivers and on the drivers who remained behind. Such impacts would have taken place if the committee that approved ABF's third proposal had been properly constituted and if it had proceeded with exemplary fairness. There is no evidence that the affected drivers were damaged any more by the action of the committee that in fact approved the third proposal than they would have been damaged had the third proposal been given fair consideration by a properly constituted committee, and if ABF had refused to permit its employee Little, to lobby the committee members, and if M. B. Harp had not participated in the final proceedings.

The trial judge conceded that the change of operations in question would have been permissible had it been properly considered and approved. He assumed, however, that a properly organized and functioning committee could have come up with a different change of operations plan and one that, presumably, would or might have been more advantageous to the drivers.

There is no substantial evidence that would support the assumption of the district court, and we agree with the defendants that when the trial court indulged that assumption and acted in reliance on it, it engaged in improper speculation and fell into clear error.

We might observe that, as the district court suggested, much of the trouble in this case has been due to the lapse of more than two years between the filing of the suit and its trial. Had the plaintiffs been able to obtain from the district court preliminary relief prohibiting ABF from implementing its change of operations pendente lite, the problem could have been solved with relative ease. The trial court could simply have directed that ABF's proposal be submitted to a new committee properly constituted and acting in a fair and rational manner. Such a preliminary order might have restricted membership on the new panel, and the preliminary order might have prohibited ABF from engaging in unfair and sub rosa lobbying activities. When the case finally came before Judge Heaney the defendants suggested that the approach just described be taken. We agree with the district court that by December, 1977 and thereafter the suggested disposition of the case had become unfeasible and that it would have been inequitable for the court to undertake to put the scattered eggs back into the original basket.

Apart from the award of damages, the judgment of the district court is affirmed. To the extent that the judgment awarded monetary damages, the judgment is reversed, the awards vacated, and the cause remanded to the district court for further proceedings consistent with this opinion.

The record before us, including the docket entries of the clerk of the district court, does not show affirmatively that the district court has ever fixed the fee of the special master. That should now be done.

The master's entitlement to a fee is not dependent on the district court's àwards of damages, nor is it affected by vacation of those awards.

Affirmed in part; reversed in part and remanded.